# Reynolds *v.* Excelsior Coal Co.
# Reynolds *v.* Tannehill.

*Bill in Equity to Remove Cloud from Title.*

1. *Fraud-averment and proof.*—Fraud is a conclusion of law from facts stated and proved—when it is pleaded at law or in equity the facts out of which it is supposed to arise must be proved—a mere general averment of fraud, without such facts, is not sufficient.

2. *Same.*—In order to authorize relief against fraud it must be proved strictly and clearly as it is alleged; if a case of actual fraud is alleged by the bill relief cannot be had by proving only a case of constructive fraud, and if the bill alleges a case of constructive fraud and the title to relief rests upon that fraud only, the bill will be dismissed unless proof of fraud of that character is made.

3. *Same.—case at bar*—Complainant, the grantor, testified that the defendant, the grantee, came to his house to buy, both, Sections 5 and 29 in a certain township, and that he agreed to sell only Section 5, but that while he was in another room the grantee substituted a deed to Section 29 for that of Section 5, which he had put on the bureau on leaving the room to get pen and ink preparatory to signing; defendant denied this, and testified that complainant was willing to deed Section 29, and not Section 5; it appeared that Section 29 was entered in the name of D. T. and Section 5 in the name of D. M. T. and complainant testified that he intended to sell land entered in the name of D. T. and not that entered in the name of D. M. T. and

the deed actually signed by him described the land as entered by
D. T. It further appeared that when defendant called on complainant
to purchase the land he expected to buy both pieces and had a deed
for each piece of land for complainant to sign, one describing a piece
as entered by D. T. and the other a piece as entered by D. M. T.
Upon these facts it was not sufficiently shown that the defendant
substituted one deed for another as alleged.

APPEAL from the Chancery Court of Shelby.

Heard before the Hon. S. K. McSPADDEN.

In the case in which the Excelsior Coal Company is com-
plainant, the bill was filed by it as the grantee, which alleged
that it did not know when it bought, nor when it took pos-
session, and when the deed to the land in controversy was
made, that its grantor had, before, through fraud or mis-
take, executed a deed to the defendants. The prayer of the
said bill was to remove and cancel the deed made by L. M.
Tannehill to the defendants as a cloud on complainants title,
and to have the defendants perpetually enjoined from claim-
ing title thereunder to the land in controversy. In the case
in which L. M. Tannehill is complainant, the bill was filed
to protect his warranty in the deed he had executed to the
Excelsior Coal Company, alleging fraud against the defend-
ants, in the procurement of the deed to the same land he
he afterwards granted to the Excelsior Coal Cmpany; and
the prayer of the bill was that the said deed be canceled,
and a perpetual injunction be issued, restraining the defend-
ants, or either of them, from asserting any right, title or
claim to the land in controversy under and by virtue of said
deed. In the first case there was a demurrer to the bill
filed, which assigned various special grounds, the most ma-
terial of which was, that complainant had a full and ade-
quate remedy or defense at law. In the latter case there
was a motion made to dismiss the bill for the want of equity.
Both the demurrer and the motion were overruled. On the
final submission of the cause, on the pleadings and proof,
the chancellor rendered a decree granting the relief prayed
for.

The principal ground on which relief is sought, is that of
fraud practiced by the defendants upon L. M. Tannehill in
procuring the execution of the deed, to the land in contro-
versy, from said Tannehill to them. The allegations setting
out the facts as to the charges claimed to have constituted
the alleged fraud, are found in the sixth paragraph of the
bill, and are as follows : "On the 31st day of January, 1890,
the defendant, William B. Reynolds, came to the house of
the said L. M. Tannehill, in Winn parish, State of Louisiana,
and made himself known to the said Tannehill as from Mon-

tevallo, Alabama, and proposed to purchase from him certain lands, which he said he had discovered belonged to said Tannehill, the same being the land hereinabove described, and the southeast ¼ of the northwest ¼ of section five in the same township and range; that the said Tannehill told him that he knew about the piece of land in section twenty-nine; that he and his brother had had some correspondence with one T. H. Aldrich, at Blocton, Alabama, in regard to purchasing it, and that his brother had gone to Alabama to make a sale of it to him, and that he had given his brother authority to represent him in the matter, and that he would not under any circumstances sell it or have anything to do with it until his brother's return; that the said Reynolds then proposed to purchase from him his interest in the other piece, being the said southeast ¼ of the northwest ¼ of section five, in the same township and that after some talk and bargaining the said Tannehill agreed to sell and deed to him whatever interest he might have in said southeast ¼ of the northwest ¼ of section five at and for the sum of one hundred and seventy-five dollars; the said Reynolds had with him, already written out, two instruments, one of which he represented to be a deed of the southeast ¼ of the northwest ¼ of section 29, and the other a deed for the southeast ¼ of the northwest ¼ of section 5; that the said L. M. Tannehill read over the one purporting to be a deed of the said S. E. ¼ of the N. W. ¼ of section 5, and being satisfied to sell and deed to him his interest in that piece, he went into the house, their interview up to this time having been outside, and placing the instrument which he had on a bureau near the outside door, went with his wife into an adjoining room to procure ink and pen, but finding no pen and ink he returned to the room, and on his return found the said Reynolds, whom he had left outside the door, standing in front of and close to the bureau and the paper which he supposed to be the one he had left there on the bureau, and that without reading or examining it to see if it were the same, and not suspecting anything wrong, he and his wife wrote their names to the paper with a lead pencil at the suggestion of the said Reynolds, in the presence of D. F. Dunn, who had come in from outside the house, and who had been brought out to his house by the said Reynolds; that the said Dunn signed his name as a witness to the instrument, and the daughter of said Tannehill, just ten years of age, was called in from the back yard, where she was at play, and, with some assistance from her mother, wrote her name as a witness to the paper; that the said Reynolds immediately folded the paper and

[Reynolds v. Excelsior Coal Co.; Reynolds v. Tannehill.]

put it in his pocket, remarking that he was in a hurry to get back to the railroad to meet a certain train; that the said Tannehill requested the said Reynolds to give him a memorandum of the land he had sold him his interest in, that he might show his brother what he had sold on his return, and that thereupon the said Reynolds wrote down on a piece of paper in pencil the southeast $\frac{1}{4}$ of the northeast $\frac{1}{4}$ of section 29, with a cross in the circle opposite it as indicating the piece he had not purchased, and the southeast $\frac{1}{4}$ of the northwest $\frac{1}{4}$ of section 5, with a pencil line drawn around it as indicating the piece he had purchased, and as he was leaving said to said Tannehill, 'Don't sell or deed away the other piece to any one without letting us know, as we will do fifty or seventy-five dollars better by you than any one else will;' your orator, therefore, upon such information and belief, charges and states that the said L. M. Tannehill never sold, or agreed to sell, never agreed to convey or intended to convey, and never received any consideration for conveying to the said defendants, or either of them, or to any other person other than the Excelsior Coal Company the said southeast $\frac{1}{4}$ of the northeast $\frac{1}{4}$ of section 29, township 21, range 4 west, that if the said defendants have a deed or instrument purporting to be a conveyance to them of said piece of land the same was obtained by fraud, and is either a forgery as to the land described therein, or was secured by substituting for the instrument purporting to convey the south-east $\frac{1}{4}$ of the north-west $\frac{1}{4}$ of section 5, which the said Tannehill had read and agreed to execute, an instrument conveying the south-east $\frac{1}{4}$ of the north-east $\frac{1}{4}$ of section 29 which he had positively and repeatedly refused to sell to him, and that thus or by some other artful contrivance his signature was secured to said instrument, or that the same has been since its execution fraudulently changed or altered, but exactly in what manner your orator and the said Tannehill are unable to state, inasmuch as neither your orator nor the said Tannehill has been able to secure a sight of the original, the same being still in the possession of the said defendants."

TOMPKINS & TROY, J. M. FALKNER, and J. B. KNOX, for appellants.

W. C. WARD, HENRY WILSON, and CHARLES TURNER, for appellees.

HARALSON, J.—For a proper decision of this case, it is necessary to ascertain from the pleadings what the precise issue of fact is. The record is of voluminous proportions, and a great mass of evidence has been introduced, much of which, according to the view we take of the case, may be eliminated from consideration, in the solution of the real issue. The arguments of counsel, on each side, are lengthy and have been prepared with great care, covering a wide field of controversy. While the subject matter involved is an undivided half interest in a forty acre tract of coal land, the contention over it could not be greater if the value were priceless, since it is supposed the character and reputation of the parties, especially of the appellants, are involeed in the settlement of the litigation. We propose to limit the discussion to the real issue, and thereby curtail its length, and save the unpleasant and unnecessary task of discussing the character of the witnesses and the principals in the transaction.

The allegations of the bill as to the fraud, by which the deed sought to be set aside is alleged to have been procured, are found in the sixth paragraph thereof, which the reporter will set out in full in the statement of the case.

The bill is distinctly one to vacate and set aside the deed held by the defendants below,—the appellants here—to the one-half interest to the land in controversy, on the ground that the same was obtained by actual fraud.

The main allegation, as will be gathered from the statement of the pleadings in the cause, is, that there were two forty acre tracts of land, in the same township and range, one in section *five*, and the other—the one in controversy—in section *twenty-nine*, and that a fraud, such as is particularly set forth, was practiced by W. B. Reynolds, one of the defendants, by which a deed to the latter tract was obtained from Tannehill, the vendor, when he had contracted to convey the former tract in section *five*. The particular land in litigation—the 40 in section 29—had been entered in the name of *David* Tannehill, and the 40 in section *five* had been entered in the name of *David M.* Tannehill.

The complainant below, appellee here, claims, that it was the purpose and intention of L. M. Tannehill, the grantor in the deed, to sell to the defendant the land in section 5, and not that in section 29; that such was the agreement and understanding between Tannehill and W. B. Reynolds; that Reynolds had with him two deeds filled out, one to the land in section 5, and the other to the land in section 29; that he handed Tannehill, and Tannehill read, the one purporting

to convey the land in section 5, which he was willing and agreed to sell; that he took the deed in the house, his wife going with him, for the purpose of executing it; and placed it on a bureau in the room, and went with his wife into an adjoining room to procure a pen and ink, but finding none, he returned to the room, and found said Reynolds,. whom he had left outside the room, standing in front of and close to the bureau, on which lay the paper he supposed to be the one he had left there, and not suspecting anything wrong, he and his wife wrote their names to the instrument with a lead pencil at the suggestion of said Reynolds, in the presence of Dunn and a little daughter of said Tannehill, who had been brought in for the purpose, and who signed the same as witnesses; that the deed was delivered to Reynolds, who paid the $175.00 to Tannehill; and upon this state of facts, the complainant charges, that said instrument, purporting to be a conveyance to defendants of said piece of land, was procured by fraud, the particular act of fraud being, as alleged, that the instrument is (1) "A forgery as to the land described therein," or (2) it "was secured by substituting for the iustrument, purporting to convey the south-east ¼ of the north-west ¼ of section 5, which Tannehill had read and agreed to execute, an instrument conveying the south-east ¼ of the north-east ¼ of section 29, which he had positively and repeatedly refused to sell to him," or (3), "that the same has been since its execution, fraudulently changed or altered."

These three charges, then, are the issues to be tried, and we are to enquire, if the instrument was a forgery, or, if it was fraudulently changed or altered since its execution, so as to make it appear to convey a different piece of land from that sold, or, if Reynolds, having in his possession two deeds, already prepared, fraudulently and surreptitiously substituted another for the one that had been accepted and was about being executed.

It is a familiar principle, that fraud is a conclusion of law from facts stated and proved. When it is pleaded at law or in equity, the facts out of which it is supposed to arise must be stated. A mere general averment of fraud, without such facts, is not sufficient.—*Louchiem & Co. v. First Nat. Bank of Talladega*, 98 Ala. 521; 3 Brick. Dig. 510, § 31. Following this rule of law, the complainant has not left us in uncertainty as to the grounds of the relief sought. It has stated them clearly and distinctly, as we have recited them above.

Another familiar principle is, that he who alleges fraud

must clearly and distinctly prove the fraud he alleges. The burden is upon him to prove his case as it is alleged in the bill. "If the fraud is not strictly and clearly proved, as it is alleged, relief can not be had, although the party against whom relief is sought may not have been perfectly clear in his dealings. Fraud will not be carried by way of relief one tittle beyond the manner in which it is proved to the satisfaction of the court. If a case of actual fraud is alleged by the bill, relief can not be had on the bill by proving only a case of constructive fraud. If the bill alleges a case of constructive fraud, and the title to relief rests upon that fraud only, the bill will be dismissed, if the fraud, as alleged, is not proved. It can not be allowed to be used for any secondary purpose."—Kerr on Fraud & Mistake, 382; *Adams v. Thornton*, 78 Ala. 490. "Though the proof may show that complainants are entitled to relief it can not be granted, unless it is shown that they are entitled to it on the grounds stated in the bill."—*Simms v. Grier*, 83 Ala. 263; *Winter v. Merrick*, 69 Ala. 86; *Munchus v. Harris*, 69 Ala. 506; 3 Brick. Dig. 402, § 571.

In *Porter v. Collins*, 90 Ala. 510, where the bill sought a rescission of a contract for the sale of land, on the ground of material misrepresentation by the vendor pending the negotiations, alleging that they were made either fraudulently or through honest mistake on his part, and the evidence showed only a mutual mistake of both parties, the variance was held to be fatal. The court said, "The bill, as we have seen, claims rescission solely on the ground of misrepresentations. Its only reference to any supposed mistake was in connection with and qualification of the allegations of misrepresentations. It avers that the transaction was induced by misrepresentations on the part of Collins, and that these were made either fraudulently or mistakenly. But, it nowhere avers that the sale was the result of the mistake of the parties. Misrepresentation either intentional or inadvertent, and not mistake, is made the *gravamen* of the bill; and upon misrepresentation and not upon mistake, the case must turn. Relief can not be granted on facts developed in evidence but not alleged, any more than upon facts alleged and not proved." (*Park v. Lide*, 90 Ala. 246.)

The case at bar is one where relief is sought, not upon any alleged, simple mistake on the part of the grantor, in the execution of the instrument sought to be cancelled, or for any alleged mutual mistake on the part of the grantor and grantees therein; but, the relief is distinctly and clearly claimed, on account of the actual fraud, as we have before

stated it, of W. B. Reynolds, one of the defendants, and to these allegations and the proofs introduced tending to support them, we bestow our attention.

The defendants in their answer, deny positively every allegation of fraud made against them, and give an account of the transaction of the execution of said deed, which, if true, is consistent with honesty and fair dealing.

As to the charge of forgery of said deed by defendants, it is sufficient to say, that no evidence has been offered to sustain it. The original deed is in evidence, certified here for our inspection, and there is every reason to believe, and nothing tending to show to the contrary, that the signatures of the grantors are genuine.

The other two charges of fraud—the substitution of another deed in place of the one intended to be signed, or its alteration after it was signed—will be considered together. The evidence tends to show, that the complainant, the Excelsior Coal Company, owned and was operating a coal mine in lands belonging to it, adjoining the forty acre tract in question, and we are not left to doubt, that the company was anxious to own it, also. On the 16th of April, 1889, T. H. Aldrich, the president of the company, wrote to R. L. Tannehill, at Winfield, La., making enquiries about the particular piece of land, entered, as he stated, by David Tannehill, his father, asking if his father had ever sold it, and if so, to whom, and stating, that if not sold, he had a customer who would give $100 for a good title to it. Not hearing from Tannehill, he wrote again, on the 7th of July, making the same inquiries about the land, and offering $200 an acre for it, and to take a quit claim to it. The correspondence resulted in a visit by R. L. Tannehill to Alabama, in the latter part of January 1889, to investigate his title to said land, and to make a sale of it. L. M. Tannehill, the other brother, and the grantor in the deed in question, gave said R. L. verbal authority to dispose of his interest in said land, if he succeeded in making a sale of it, while he was in Alabama.

It is also put beyond question, that the defendants had been anxious, themselves, to become the owners of this tract of land, and to purchase it, before the complainant did so. They deny, and the evidence does not clearly show to the contrary, that they knew Aldrich was negotiating for the land, but the concern they manifested about it, the diligence they exercised to ascertain who were the heirs of David or D. M. Tannehill, the haste they made and the expense and trouble they took upon themselves, to acquire the title, and their conduct after they had acquired the deed to L. M. Tan-

nehill's half interest, and the effort they made to purchase the other half from R. L. Tannehill,—all show, if they did not know that Aldrich was negotiating for the land, that he would do so, and might purchase it, at any time. In this, however, there was no impropriety. They had a right, without injustice to complainant, to purchase the land, ahead of it, even for the purpase of speculation, and of selling it to complainant at a price very much greater than it would cost them.

Without any delay, as soon as W. B. Reynolds learned of the whereabouts of the Tannehill heirs, he went directly to see them, for the purpose of purchasing the land. He had ascertained, that there was another 40 acres in section 5, same township and range, which had been entered by *D. M.* Tannehill,—the 40 in section 29, having been entered by *David* Tannehill. He supposed that the names D. M. and David Tannehill, represented one and the same person—the father of said R. L. and L. M. Tannehill.

Before leaving Birmingham on his way to Louisiana to see these parties, said Reynolds procured two printed forms of blank deeds, and filled them out. The originals, as before stated, have been transmitted by order of the Chancery Court for our inspection, and are before us. One conveys from "*R. Lafayette and Monroe Tannehill, only heirs of David Tannehill, to H. C. and Wm. B. Reynolds,* . . *the south-east quarter of the north-east quarter of section twenty-nine* (29), *township 21, R. 4, W., known as the David Tannehill entry,—containing 40 acres or more;* . . situated in *Shelby* county, Alabama." The other unexecuted deed, is filled out in the same way, to convey from the same grantors to same grantees, "*The S. E. ¼ of N. W. ¼ of sec. 5, T. 21, R. 4, W., containing 40 acres or more, known as the David M. Tannehill entry, situated* in *Shelby* county, Alabama." The words italicised are written in the blank places of the printed deeds. In the first deed, the section and numbers of subdivisions, are, for the most part, written in full, whereas, in the second, letters are employed. But this, we take it, from common usage in such matters, is of no significance. The writing in both deeds seems to be in the same hand, and with same pen and ink, and if there is anything on the face of the instruments, to indicate that they were not written at the same time, by the same person, we are unable, after close inspection, to detect it. W. B. Reynolds swears, positively, that they were, and that there has been no change in either, and that they are the identical papers, in every respect, except that he erased the name of Fayette Tannehill

from the one that was executed, at the request of Mrs. Tannehill, at the time it was signed, and filled in with the consideration paid, and the date and the probate before the J. P. It is observable, and ought to be stated, as corroborative of Reynolds' statement of the identity of the paper, that the probate of the deed by Dunn, is filled out in the same handwriting as that found in the body of the deed, but in a different and blacker ink.

According to Reynolds' version of the execution of the deed by Tannehill and wife, he, Reynolds, told them they had *two forties* in Alabama, instead of one and he had come, and desired to purchase both of them; that one forty was entered by David, and the other by D. M. Tannehill; but, he had no doubt that it was his father, and David and D. M. stood for the same man, and that the lands were coal lands. He showed them both deeds, and they informed him, that they knew of but one 40, from information derived from Mr. Aldrich; but R. L. Tannehill was then in Alabama to see about the land; that he told them the 40 in section 5 was entered in the name of D. M., and that in 29, in the name of David Tannehill; that Tannehill said he would not sell the D. M. Tannehill land, at any price, as he was satisfied that was the land his brother had gone to Alabama to see about, and that he would not sell the David Tannehill forty, because he was afraid it was not his father's land, and that he had no interest in it; that if the entryman had "M," in his name, he would be certain that it was his father's, and he did not desire to bring disgrace on his family, by selling a thing that did not belong to him; that Reynolds then asked him to sell him the D. M. Tannehill entry, in section 5, about which he had no doubt, but this he refused to do, before his brother returned from Alabama; that Reynolds offered him, first, $100 for the David Tannehill land, again $125, and finally, $175, which he agreed to take, having offered to sell it for $200, if Reynolds would take the risk of its being his father's land, which he was willing to do. Reynolds also swears, that he answered truthfully, every question Tannehill and his wife propounded to him about the two pieces of land, as to its location, quality, and by whom entered, and misled them in nothing; that they saw the two deeds, refused to sell the D. M. land, but did consent to sell that entered by David, and executed the deed thereto; that Mrs. Tannehill, before signing, requested that Fayettee Tannehill's name should be erased as a grantor, which was done; that after the execution of the deed, he put it in his pocket, and left with Dunn, one of the witnesses, to have it probated, which

20

was done before a J. P.; that the negotiations were conducted on the porch, and when an agreement was reached, they all walked in the room, and Tannehill, having the deed in his hand, laid it on the bureau in the room where they all were, and went to the mantel to get a pen and ink, and finding none, Mrs. Tannehill went in an adjoining room to look for the writing materials, and immediately came back and said her little girl had carried them to school; that he, Reynolds, told them they could sign with a pencil; that he opened the deed out, and wrote in it, the consideration, and filled in the date, and Tannehill and wife signed their names to it in his presence, and that of Dunn and Tannehill's little daughter, as witnesses.

This was on the 31st January, and the next day, the 1st of February, R. L. Tannehill being in Alabama, made a written contract with complainant, to sell to it, his own, and his brother's title to the 40 acres in question, for the sum of $1,000, agreeing that a deed should be executed by them, immediately on his return to Louisiana, which deed—the one sought to be set aside—was executed on the 6th of February, and returned, when the balance of the purchase money was paid,—the sum of $20 having been paid in cash at the date of the execution of the contract, as a part of the consideration.

The three witnesses examined by complainant, viz: L. M. Tannehill, Harriet H. Tannehill, especially, and D. F. Dunn, in their direct examination, give an account of this transaction variant from and contradictory of that given by W. B. Reynolds.

L. M. Tannehill, in his direct examination, testified, that T. H. Aldrich first brought to his attention, by correspondence between them, that he and his brother owned the land in litigation, and that he desired to purchase it. This statement, as to the identity of the land, he made, "to the best of my (his) knowledge." He also further stated, that he had information, that Oliver, who was acting as their agent, said he could get $500 for the land; that he verbally authorized his brother, R. L. Tannehill, when he went to Alabama, to sell his interest in the land, at the same price for which he could sell his own; that said R. L. did make a contract of sale of both their interests in the land to complainant, on the 1st day of February, 1890; that W. B. Reynolds came to his house in La., on the day before the 31st January, 1890, and told him that the object of his visit was to buy some land, and offered him $125 for his half interest in section 5, which he said was owned by witness; that it lay

down in a wilderness, adjoining some lands he and his father owned, which was the reason he desired to buy it; that a New York company would be there, soon, to purchase their lands, and he claimed this land was entered by David Tannehill; that witness told him he did not know about selling the David Tannehill entry, when his father signed his name, D. M. Tannehill, to which Reynolds replied, it would make no difference, since David and D. M. Tannehill was the same person. Witness then says: "We argued some time over the land, and then I told him, if he would take all responsibility, and give me $200, for my half interest, I would sell to him. He then agreed to split the difference, and offered me $150. After arguing some time, he offered me $175, for it, if I would make him a deed to it, which I agreed to do, he taking all responsibility on himself. After this he drew the deeds out of his pocket in a large envelope, which he said were separate deeds to each piece of land, sections 5 and 29. He handed me the deed to section 5, which he said was section 5. 1 looked through it, and the number showed up the same as the description he gave me of it. The deed was partially filled out, portions of it a blank. With the deeds, he took out a plat, which he said was lands marked off in Shelby County, Alabama. He ran across the plat, and showed me the two different pieces of land, where section 29, lay.  ·  ·  We were sitting on the gallery. I got up with the deed in my hand, to the lands in section 5, after I decided that I would take $175, for my half interest. I turned round, and walked in the door of the house, laid the deed on the bureau, and said to my wife, where is the pen and ink? I walked on through the house into a side room to look for the pen and ink. My wife followed me into the room, and told me there was no pen and ink there, that our little girl had it all at the school house, leaving Reynolds on the gallery at the time. On my return back into the house (room), Reynolds was standing in front of the bureau, with his hand apparently on the deed that I had left there. I told him I could not find any pen and ink; that my little girl had it off at the school house. He said that he did not know that it made much difference, anyhow, and handed me his pencil, and then I called Mr. Dunn, and I signed the deed, which I supposed I had laid on the bureau, as I went through the house. My wife also signed it."  ·  ·  "Reynolds left my house about 5 minutes after the execution of the deed by myself and wife, and said he was sorry that he had made the trip and not got both pieces of the land, and said to be sure

and let him know, before I signed away my rights, provided my brother had not sold that piece of land, and he would do $50 or $75 better by me than any one else." Mrs. Harriett A. Tannehill, testified substantially to the same as her husband did, and Dunn's recollection is, that the agreement related to section 5, but he never read the deed or heard it read. As he went into the room, Reynolds was standing by the bureau, and Tannehill and wife had gone into a side room to look for pen and ink. He says he saw Reynolds have two papers on the gallery, which he said were blank deeds, but he only presented one for signature.

Let us refer, now, to the testimony of these witnesses on the cross examination. L. M. Tannehill, the grantor in the deed, and the complainant in one of the suits being tried, testified that he was examined as a witness before Judge Cobb, in the last days of February, or the 1st of March, 1890, touching these very matters; that he stated on the examination, "that the land Aldrich wrote about was the land entered by D. M. Tannehill," and the land D. M. entered was in section 5. Again he says, that he did say also in substance, "Well, there are two pieces of land, but I could not tell, if I was going to be hung, the difference in the sections, without looking at the numbers that had been given me before; that I only knew them by the initials of the entry name; that I could not tell the numbers if I were going to be hung; that I could only give the numbers that he, W. B. Reynolds gave me. I did tell Reynolds, that I would sell him the land entered by David Tannehill, if he would take all the risks, as I did not know whether my father entered any land in the name of David Tannehill or not. I told him I would not sell him the land entered by David M. Tannehill, under any circumstances." He further testified, that he did not know that he had more than one forty acres of land in Alabama, until he was informed by Reynolds, at the time of his visit to him in Louisiana, and that the only 40 acres he knew of, before that time, was the 40 which had been entered in the name of David M. Tannehill, in section 5. Again he says, "I intended to sign a deed to the land entered by David Tannehill in section 5. I did not intend to sign a deed to land entered by David M. Tannehill. It is a fact, I declined to sell the land entered by David M. Tannehill. I did say, that I would sign a deed to the land entered by David Tannehill, if Reynolds would take the risk. I would not have signed a deed which purported to convey lands entered by David M. Tannehill." "It is a fact, that in all the conversation between me and Reynolds, the land

was spoken of, the one piece as the David Tannehill entry, the other piece as the David M. Tannehill entry, and the land I agreed to sell was the David Tannehill entry." In answering further, he said, he stated on the former examination, that at the time he signed the deed it was lying open so as to enable him to see the description of the land; that Reynolds told him one of the reasons why he desired to purchase this particular piece of land, was that he and his father owned lands about it; that Reynolds marked off on a plat, the lands and showed the different sub-divisions, and that the land he wanted to buy, was surrounded by their own lands; and was towards the bottom of the plat, and he, witness, considered the top part of the plat as the north. (It is a fact, that 29 lies at the bottom part of the plat, and 5 at the northern, or upper part.)

Mrs. Tannehill adheres, on the cross-examination, more strictly to her evidence given in the direct examination, than her husband did to his, but she does say, that she remembered the two sections, 5 and 29, but she did not remember anything about the numbers; that she heard her husband state that his father, D. M. Tannehill, had entered a piece of land in section 29; that her husband agreed to sell the land entered by David Tannehill, in section 5, and she remembered that Reynolds said the land her husband agreed to sell him, was described as the land entered by David Tannehill.

D. F. Dunn, on the cross-examination, testified that on the examination before Judge Cobb, in March, 1890, he had testified he could not repeat the numbers of the land, but that to the best of his recollection it was section 5, and was the David Tannehill entry; that Reynolds said, there was another entry that was called the D. M. Tannehill entry; that on the occasion of the purchase, Reynolds spoke of two entries—one, the D. M., and the other, the David Tannehill entry—and he did not know what the deeds described.

The evidence of these witnesses on direct examination, as appears, tended to support the contention of complainant—that Reynolds substituted a deed to lot 29 in the place of the deed to lot 5, which had been agreed to be executed. On the cross examination, however, it is manifest, the strength of this evidence is much weakened, and is pursuasive to show, that in making sale of the land, the grantors were intent upon not selling the land entered in the name of D. M. Tannehill, but were willing to sell, and did sell that entered in the name of David Tannehill; that they are in confusion about the numbers, and their memories are not to be trusted as to that, especially when by holding them to be infallible,

[Reynolds v. Excelsior Coal Co.; Reynolds v. Tannehill.]

they involve W. B. Reynolds in fraud and perjury. In one thing, on the direct and cross examinations, Tannehill and his wife are consistent and unconfused in their statements, and that is, that they did not consent to sell the land entered in *the name of D. M. Tannehill,* but did sell that entered in *the name David,* and that is just what their deed showed they did do. Tannehill swears, the deed he held in his hand and laid on the bureau, described the land as having been entered by David, and not by D. M. Tannehill. He was particular and certain as to that, but was not certain as to numbers. And yet, the deed he did sign, contained that very description of entry. In what did the deed alleged to have been fraudulently substituted by Reynolds differ, then, from the one Tannehill intended to sign? Not, certainly, in the description of the entryman, for the one signed, as stated, describes the land as entered by David—the very description he says he intended to adopt. This is a powerful fact in support of Reynolds' version of the transaction. The only possible way, therefore, for such a substitution to have taken place, was for Reynolds to have had two deeds, both made out alike, as to the entryman, but with different land numbers, whereas, the evidence tends strongly and almost conclusively to show, he had two deeds, already filled out, one for each piece of land—the one describing a tract as having been entered by David, and the other, another tract by D. M. Tannehill—or, if not this, that he altered the deed by erasing 5 and substituting 29, for it, after it was executed, of which the originals contain no internal evidence, and the proof is not satisfactory to show. Reynolds went there, as he swears, and as the Tannehills testify he told them, and as he offered to do, to buy both pieces of land. If he expected to be able to purchase both pieces, it was the natural thing to do, if he prepared any deeds at all, to correctly prepare them for each separate piece. The idea of his having, beforehand, prepared himself with two deeds, with the name of David in each as the entryman, to accomplish the fraud with which he is charged, involves an amount of prescience, as to what would occur in the transaction, to give him an opportunity to shuffle the one deed for the other, such as we can hardly attribute to the most trained gambler, who would rob his adversary in a false deal of the cards.

The demurrer to the bill was properly overruled, but the proof falls short of sustaining the allegations of fraud, on which relief is based, and the bill must be dismissed.

The case No. 965, submitted on the same evidence, for like reasons, must share the same fate.

Reversed and dismissed.